NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMELIA ANASTASIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: 08-1880 (JLL) |
| v. ) | |
| ) | **OPINION** |
| CUSHMAN & WAKEFIELD, ) | |
| CITIGROUP, and CITIGROUP REALTY ) | |
| SERVICES, ) | |
| ) | |
| Defendants. ) | |

**LINARES, District Judge.**

This matter comes before the Court on the motions for summary judgment [CM/ECF #46, 47] by Defendants Citicorp[1] ("Citicorp") and Cushman & Wakefield ("C&W"). No oral argument was held. Fed. R. Civ. P. 78. For the reasons set forth in this Opinion, summary judgment is granted.

**INTRODUCTION**

C&W hired Plaintiff Amelia Anastasia ("Plaintiff" or "Anastasia") in 2001 to work at a Citicorp property in Weehawken, New Jersey. (Pl. Opp. Br. at 5.[2]) Anastasia was supervised by two individuals: David Hardy ("Hardy"), a C&W property manager, and Bruce Cobb ("Cobb"), a

---

[1] Plaintiff asserts that Citicorp, not Citigroup, is the entity she seeks recovery from. (Pl. Opp. Br. at 2.)

[2] Plaintiff incorporated her Local Rule 56.1 statement of material facts into her opposition brief. Facts cited to Plaintiff's brief in this Court's introduction are abstracted from that portion of Plaintiff's brief.

1

Senior Voce President of Citicorp who managed properties for Citicorp. (Id.) Citicorp and C&W had a contractual relationship regarding property facilities management. (Id.) This contractual relationship resulted in Citicorp funding the salaries and benefits of C&W employees working on Citicorp properties. (Citicorp Br. at 2.)

Cobb originally interviewed Anastasia, assigned her work, approved various changes in her work status and salary, and recommended her for a promotion in 2004. (Pl. Opp. Br. at 5.) In April of 2006, Anastasia was up for another promotion on Cobb's recommendation, for a property manager position in Jersey City, New Jersey. (Id.)

On April 18, 2006, Cobb and Anastasia were at lunch together when Cobb confessed to long-held romantic interest in Anastasia. (Id. at 6.) Anastasia rebuffed Cobb's advances. (Id.) Cobb renewed his advances later that day, going so far as to grasp Anastasia's arm while complimenting her. (Id.)

On April 19, 2006, Cobb requested a photograph of Anastasia and her boyfriend and sought further contact. (Id.) She had become upset by Cobb's behavior, and sent an email to Cobb at 2:33 A.M. on April 20, 2008, stating that her discomfort necessitated leave from work. (Id. at 6-7.) Cobb responded that he had no more feelings for her, but Anastasia insisted that she needed time off. (Id. at 7.)

Cobb and Anastasia continued to communicate on April 21, 2006. (Id.) Cobb emailed Anastasia and attempted to reconcile in a friendly manner while reminding Anastasia of her upcoming opportunity for promotion. (Id.) Anastasia replied that she accepted Cobb's apologies but requested an end to further communication at that time. (Id. at 8.) Cobb then continued to contact Anastasia by email through April 22; when Anastasia failed to respond, Cobb called, at


which time she expressed her displeasure with his continued attempts to contact her. (Id.) Cobb continued to email Anastasia through April 25, including communicating information about her promotion opportunity. (Id. at 8-9.)

Anastasia responded to Cobb on April 26, telling him that his continued contact with her troubled her and caused her distress. (Id. at 9.) Anastasia followed up her email by a call to Hardy complaining of the contact from Cobb. (Id. at 10.) Grace Ben-Ezra ("Ben-Ezra"), an human relations manager at C&W called Anastasia on April 28. (Id.) The parties disagree as to what Ben-Ezra told Anastasia about her leave; Anastasia believes that Ben-Ezra told her not to come in, while Ben-Ezra claims that she made the issue of Anastasia's return dependent upon Anastasia's comfort. (Id.) Anastasia did not respond to further attempts by Cobb to reach her, but she did forward one to Ben-Ezra. (Id.) Cobb was ordered to stop contacting Anastasia on or about May 3, 2006, after which date no contact is alleged. (Id. at 11.)

Plaintiff asserts that she was paid while on administrative leave by Citicorp until June 15, 2006, and that she was paid from June 16 through June 30, 2006 by C&W. (Id.) C&W terminated Anastasia on June 30, 2006, taking her failure to voluntarily return to work as a resignation. (Id.) Ben-Ezra believed that Anastasia did not wish to return to the Weehawken office out of concern that Cobb's supervisor would present problems for her at work. (Id. at 12.) Anastasia disputes Ben-Ezra's belief, and asserts that she did not express such a concern. (Id.)

Citicorp investigated Anastasia's complaints about Cobb and found that Cobb had not violated Citicorp's sexual harassment policy, but issued Cobb a "final warning" on May 31, 2006. (Id.) Citicorp examined solutions to Cobb and Anastasia working together, but was unable to transfer Cobb to another position or to find an alternative to Anastasia reporting to

3

Cobb.  (Id.)  The notes of a Citicorp human relations manager indicate, however, that Anastasia was offered a promotion after April 18, 2006, which would have given her a different workplace location.  (Id.)

Anastasia eventually returned to work at C&W in Minnesota on July 31, 2008, in a different position, a temporary client services job.  (Id. at 13.)

**DISCUSSION**

In her opposition papers, Anastasia concedes that she does not have sufficient evidence to pursue Court IV of her Amended Complaint.  (Pl. Opp. Br. at 3.)  This Court finds that Count IV of the Amended Complaint is, therefore, dismissed with prejudice.  As Count III of the Amended Complaint has been previously dismissed by this Court, Plaintiff's only remaining claims are for a hostile work environment and constructive discharge under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to 49 (Counts I and II of the Amended Complaint).

**A.   Legal Standard**

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  Id. at 324.  In so presenting, the non-moving party must offer specific facts that establish a

genuine issue of material fact, not just "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings. See Celotex, 477 U.S. at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

**B.     Hostile Work Environment**

A hostile work environment claim under the NJLAD requires a plaintiff to prove (1) that the conduct would not have occurred but for the employee's protected class and that the conduct was "(2) severe or pervasive enough to make a (3) a reasonable [member of the protected class] believe that (4) the conditions of employment were altered and that the working environment is hostile or abusive." Lehmann v. Toys R Us, Inc., 626 A.2d 445, 454 (N.J. 1993) (emphasis in original removed). In determining whether similar conduct is severe or pervasive, New Jersey courts have looked to the following factors:

> (1) the total physical environment of the plaintiffs' work area; (2) the degree and type of obscenity that filled the environment of the workplace, both before and after the plaintiffs were assigned to the specific workplace; (3) the nature of the unwelcome sexual words or sexual gestures; (4) the frequency of the offensive encounters; (5) the severity of the offensive encounters; (6) whether the unwelcome comments or gestures were physically threatening; (7) whether the offensive encounters unreasonably interfered with any plaintiff's work performance, but subject to the admonition that each plaintiff is not obliged to prove that the unwelcome comments

> or gestures actually did interfere with each plaintiff's work performance; and (8) whether the offensive encounters had an effect on any plaintiff's psychological well-being, but also subject to an admonition that each plaintiff need not demonstrate specific psychological harm, for, as we have noted, the nature of the harm to any plaintiff is the creation of a hostile work environment.

Baliko v. International Union of Operating Eng'rs, Local 825, 730 A.2d 895, 903-04 (N.J. Super. Ct. App. Div. 1999).  In addressing hostile work environment claims under the NJLAD, the focus is on the harassing conduct and the effect of such conduct must be examined as a whole, not individually, but a single event can suffice to show a hostile work environment.  Lehmann, 626 A.2d at 454, 455.

Both Citicorp and C&W argue that Cobb's behavior was not severe enough or pervasive enough to support a hostile work environment claim under New Jersey law.  (Citicorp Br. at 20-23; C&W Br. at 24-29.)  Plaintiff maintains, without citing cases other than Lehmann, that material issues of fact exist with respect to the severity and pervasiveness of Cobb's post-April 18, 2006 conduct that require that her case go to a jury.  (Pl. Opp. Br. at 17-19.)

Both Defendants cite the case of Godfrey v. Princeton Theological Seminary, 952 A.2d 1034 (N.J. 2008), for the proposition that annoying, but not harassing, unwanted advances do not create a hostile work environment under the NJLAD.  In Godfrey, a male resident at a seminary repeatedly invited female seminarians to events, touched them in non-suggestive and non-coercive ways, sent unwanted gifts, and made telephone calls, including follow-up calls to unanswered invitations.  952 A.2d at 1038-42.  The Supreme Court of New Jersey, examining these facts in a light "stripped of the overlay of [the plaintiffs'] subjective reactions to these interactions," found that the Godfrey plaintiffs suffered only awkward social interactions with the

male resident and that "[p]ersons who are socially tone deaf are not, by that characteristic, necessarily the equivalent of sexual harassers." Id. at 1046-47.  The Godfrey court, in support of its analysis, cited cases that emphasized the forwardness and sexualized nature of conduct required to demonstrate a sexually hostile work environment.  Id. at 1046 (listing cases alleging groping and sexually suggestive comments).

Here, weighed in the "reasonable-woman standard" as mandated by Godfrey, Cobb confessed a romantic attraction to Plaintiff, but also claimed to know to be impossible to enter into such a relationship.  Id.  Viewed in the light most favorable to Plaintiff, this was not an "innocent" confession, but was offered in the hope that his feelings would be reciprocated and acted upon.  When Plaintiff did not return Cobb's affection, Cobb's continued communications with her emphasized his being able to get over his affection for Anastasia, discussed some work-related topics, and again asserted his understanding that a Cobb-Anastasia relationship was not possible.  Anastasia does not allege that Cobb made lewd suggestions, offered an explicit quid pro quo scenario, or touched her inappropriately.  Anastasia continued to communicate with Cobb until April 26, eight days after the lunch confession, and only at that point did she request Cobb to cease contacting her and complain to her manager at C&W.

The only point in which the Anastasia/Cobb relationship goes beyond the facts of Godfrey are in Cobb's unwanted communications with Anastasia between April 26 and May 3. In Godfrey, the New Jersey Supreme Court found that the NJLAD was not an appropriate lever with which to move school authorities to dismiss unwanted suitors.  Id. at 1047.  Although Cobb did resume communications with Anastasia after being asked to stop, this Court does not find them to be substantial enough or suggestive enough to support a hostile work environment claim

even when viewed together with his prior conversations, text messages, and emails.  Cobb sent an email on May 2 and two text messages on May 3, and ceased further contact when so advised by C&W on May 3.  (Pl. Br. at 10.)  Although Cobb sought further contact with Anastasia through those May 2 and 3 messages, he did not intimate any lewdness or express a desire for a sexual relationship.  (Id. at 10-11 (referring to a desire not to harm their prior relationship in May 3 communication).)

      Even in the absence of a case such as Godfrey, viewing Cobb's conduct under the Baliko factors supports the conclusion that his conduct was not severe or pervasive enough to establish a hostile work environment.  Several of the factors flatly weigh against Anastasia: there is no indication that the work environment in general was sexually hostile, that obscenities were employed at work, that sexual gestures were made around her, or that she was physically threatened.  730 A.2d 895, 903-04.  The remainder of the Baliko factors fail to persuade this Court that a reasonable fact-finder could conclude that Plaintiff was subject to a hostile work environment.  The allegedly offensive conduct took place in approximately two dozen communications over seventeen days, only three of which were sent after Plaintiff requested Cobb to desist.  While Plaintiff continued going to work after Cobb's confession, she had a few contacts with Cobb, but they were not of a kind that unreasonably interfered with her work; he asked her to help him find something and spoke to her a few times.  The one factor unequivocally weighing in favor of Plaintiff on the instant motion, where the facts must be viewed in the light most favorable to her, is that she was distressed by Cobb's confession.  This lone factor in her favor, however, is not sufficient for this Court to deny Defendants' motions.  Summary judgment is, therefore, granted to Defendants on Plaintiff's hostile work environment claim.

### C.     Constructive Discharge

"Generally, a constructive discharge under the LAD occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Shepherd v. Hunterdon Developmental Ctr., 803 A.2d 611, 627 (N.J. 2002) (alteration in original) (quotations omitted).  All parties concur that a constructive discharge under the NJLAD requires a greater showing than a hostile work environment claim: "constructive discharge requires not merely 'severe or pervasive' conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Shepard, 803 A.2d at 628.  The New Jersey Supreme Court has expressly stated that constructive discharge requires a plaintiff to show conduct that is "more egregious" than that which would support a hostile work environment claim.  Id.

This Court has already found, supra, that Plaintiff cannot demonstrate sufficient facts to survive summary judgment on her NJLAD hostile work environment claim.  Although she argues that Cobb attempted to "control her life" through his post-confession contact with her, the record indicates that Cobb was deterred from contacting her after relatively little effort on her part, and his communications contained nothing objectively "outrageous, coercive and unconscionable." Jones v. Aluminum Shapes, Inc., 772 A.2d 34, 44-45 (N.J. Super. Ct. App. Div. 2001) (noting that "overtly sexual and extremely rude" conduct was not sufficiently outrageous).  This Court, therefore, grants summary judgment to Defendants on Plaintiff's constructive discharge claim.

9

## CONCLUSION

For the reasons heretofore given, Defendants' motions are granted. An appropriate Order accompanies this Opinion.


DATED: June 10, 2010                                  /s/ Jose L. Linares
                                                     United States District Judge